```
 1                  IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2     _____

 3     United States of America,    ) Criminal Action
                                     ) No. 1:21-cr-00237-RDM-2
 4                     Plaintiff,    )
                                     )
 5     vs.                           ) Motion Hearing (via Zoom)
                                     )
 6     Matthew Leland Klein,         ) Washington, D.C.
                                     ) April 20, 2021
 7                     Defendant.    ) Time:  3:00 p.m.
       _____
 8
                    Transcript of Motion Hearing (via Zoom)
 9                              Held Before
                   The Honorable Randolph D. Moss (via Zoom)
10                      United States District Judge
       _____
11
                          A P P E A R A N C E S
12
       For the Plaintiff:       Christopher K. Veatch
13     (via Zoom)               U.S. ATTORNEY'S OFFICE
                                Northern District of Illinois
14                              219 South Dearborn Street, 5th Floor
                                Chicago, Illinois 60604
15
       For the Defendant:       Steven R. Kiersh
16     (via Zoom)               LAW OFFICE OF STEVEN R. KIERSH
                                5335 Wisconsin Avenue, Northwest
17                              Suite 440
                                Washington, D.C. 20015
18
       Also Present:            Da'Shanta' Valentine-Lewis, Pretrial
19     (via telephone)          Services Officer

20     _____

21     Stenographic Official Court Reporter:
       (via Zoom)               Nancy J. Meyer
22                              Registered Diplomate Reporter
                                Certified Realtime Reporter
23                              United States Courthouse, Room 6509
                                333 Constitution Avenue, Northwest
24                              Washington, D.C. 20001
                                202-354-3118
25
```

1          P R O C E E D I N G S

2              (REPORTER'S NOTE:  This hearing was held during the
   COVID-19 pandemic restrictions and is subject to the
3  limitations of technology associated with the use of
   technology, including but not limited to telephone and video
4  signal interference, static, signal interruptions, and other
   restrictions and limitations associated with remote court
5  reporting via telephone, speakerphone, and/or
   videoconferencing.)

6

7              THE COURTROOM DEPUTY:  This is Criminal Action

8  21-237, the United States of America v. Matthew Leland Klein.

9              The defendant is appearing by video.  Also by video for

10 the government, Christopher Veatch; for the defendant, Steven

11 Kiersh; and from pretrial services, Da'Shanta' Valentine-Lewis.

12             THE COURT:  All right.  Well, greetings, everybody.

13             Before we get going, let me ask, Mr. Kiersh, if you've

14 had a chance to confer with Mr. Klein about our conducting

15 today's proceeding by videoconference and whether he consents

16 to do so.

17             Do we have Mr. Klein?

18             THE DEFENDANT:  I'm here.

19             THE COURT:  I'm sorry.  Mr. Kiersh.

20             THE COURTROOM DEPUTY:  We did have him, Your Honor.

21             THE COURT:  We may have lost him.  Let's see if we

22 can get him back.

23             THE COURTROOM DEPUTY:  He was on for a while in

24 advance of the time.  I'm not sure what happened.

25             THE COURT:  Mr. Veatch, do you have contact

3

1    information for Mr. Kiersh?  Can you reach out to him?

2              MR. VEATCH:  Yes.  Will do, Your Honor.

3              THE COURT:  Thank you.

4              (Off the record.)

5              MR. VEATCH:  Your Honor, I had contact with

6    Mr. Kiersh.  His computer is having some difficulties.  He's

7    trying to get back in, but I provided him the dial-in number as

8    well, so he may be calling in shortly as well.

9              THE COURT:  Thank you.

10             (Off the record.)

11             THE COURT:  Let me ask the deputy clerk to call the

12   case again.

13             THE COURTROOM DEPUTY:  Yes, Your Honor.  This is

14   Criminal Action 21-237, the United States of America v. Matthew

15   Leland Klein.  The defendant is appearing by video.  Also by

16   video for the government, Christopher Veatch; for defendant,

17   Steven Kiersh; and from pretrial services, Da'Shanta'

18   Valentine-Lewis.

19             THE COURT:  All right.  Well, thank you, all, for --

20   for joining.

21        Before we get going, let me ask Mr. Kiersh whether he

22   has conferred with Mr. Klein about doing this by

23   videoconference and whether he consents to do so.

24             MR. KIERSH:  Yes, Your Honor.  Steven Kiersh on

25   behalf of Matthew Klein.  I am appearing via Zoom.  I apologize

1    for the technical difficulties.

2           And Mr. Klein is prepared to go forward via Zoom.

3                THE COURT:  All right.  Well -- and he's in Oregon;

4    is that right?

5                MR. KIERSH:  That's correct.

6                THE COURT:  Well, in light of where -- where he's

7    located and the ongoing pandemic, the Court concludes that it

8    is appropriate for us to proceed today by videoconference.

9           Mr. Kiersh, it's your motion.  So I'm happy to let you

10   go first.

11               MR. KIERSH:  Thank you, Your Honor.

12          Your Honor, we initially cite to the recent decision

13   from the United States Circuit Court of Appeals in *Munchel*,

14   which is cited in our pleadings.  And in that case, the Court

15   relied on *United States v. Salerno* where it was noted -- and

16   it's been noted many times -- that liberty with respect to

17   pretrial detention is the norm.

18          We emphasize a number of factors with respect to

19   Mr. Klein in support of our motion for -- to institute

20   conditions of release.  Number one, he has no prior record.

21   He's 24 years of age, and he's a matriculating student at a

22   university in Oregon.  It's the university of -- George Fox.

23   He's a senior there, and he's just a few credits shy of

24   graduating.

25          His parents, both of whom are on this call, are

1    Christian missionaries who are deeply involved in his life.

2    We've -- we've provided the Court with a verified address in

3    Oregon where Mr. Klein can reside -- it's a farm about three

4    hours outside of Portland -- with his aunt, and his mother has

5    indicated that if need be, she will move to that location to

6    supervise Mr. Klein and to ensure that he complies with any

7    condition -- any conditions of release.

8        Mr. Klein has no prior convictions.  He has this pending

9    case in Oregon, which is a misdemeanor gun case and which is --

10   I believe it's still trailing this case.  So he has a perfectly

11   clean record.  He has a verified address.  He has in the past

12   been very gainfully employed.  We outlined three separate

13   instances of employment.  And, once again, to reiterate, he is

14   a matriculating student at George Fox University.

15       The government in its opposition to the motion for

16   conditions of release, throughout their pleading they attempt

17   to conflate the actions of Mr. Klein with those of his brother,

18   his co-defendant.  And as we said in our reply, we submit that

19   that's improper and that Mr. Klein's case should be resolved on

20   his own particular merits.

21       Mr. Klein did travel to Washington, D.C.  There was

22   nothing inappropriate, nothing improper about that.  He stayed

23   overnight.  He went to an organized, completely legal rally

24   which was attended by thousands of people.  Nothing illegal

25   about that.  He was exercising his right to freedom of

1   assembly.  He was exercising his right to speak with other

2   people.

3         He is not alleged to be a member of the Proud Boys.

4   That is his brother.  That is not Matthew Klein.  He is not

5   alleged to be a member of any organization, right wing or left

6   wing, peaceful, not peaceful.  He's just there as an

7   individual.

8         The government produces photographs of Mr. Klein with

9   his brother.  Those photographs do not depict any wrongful

10   behavior on the part of Mr. Klein.  He's wearing very typical,

11   very average clothes for a 24-year-old person visiting the

12   nation's capital.  He's not making any hand signals.  His

13   brother, if anyone, is the person who's making hand signals.

14   This is not Matthew Klein.  And, again, there's nothing wrong

15   with -- I would submit, with making hand signals.

16         He attended a rally that was headed by the President of

17   the United States at the time, Donald Trump.  Donald Trump was

18   the featured speaker at the rally.  Mr. Klein was present.  He

19   stood there, and it was the President of the United States who

20   told the crowd to go march to the United States Capitol.  This

21   was not Matthew Klein saying do it.  And, quite frankly, there

22   was nothing illegal about that.  Mr. Klein then marched with

23   other people to the United States Capitol.  And at that point,

24   there was absolutely nothing -- nothing -- going on that's

25   improper or illegal on the part of Matthew Klein.

1          The government, even though they filed a lengthy

2     pleading, it's the same pleading, basically, that they filed in

3     Oregon.  And the allegation against Mr. Klein is that there's

4     no violent conduct on the part of Mr. Klein against any

5     individual.  He's not in possession of bear spray.  He's not in

6     possession of any other toxic substances.  He's not in

7     possession of a weapon.

8          And going back again to where the government is trying

9     to conflate these two young men is the government talks about

10    his brother's cell phone and that his brother's cell phone puts

11    him in the area.  There is no inculpatory cell phone data that

12    the government can use against Matthew Klein, and they don't

13    allege that there's any.  And in the footnote they specifically

14    say we don't have this type of phone data against Matthew

15    Klein.

16         What they allege he did was that he entered the building

17    and was with some people when a door was wrenched open.  That's

18    it.  There's no assaultive conduct.  There's no assaultive

19    behavior.  He's not on the front lines antagonizing anybody,

20    threatening anybody.  He's just there.  And if we take the

21    government -- we give the government the benefit of the doubt

22    as to what they say (indiscernible due to poor audio quality)

23    wrench open the door.

24             THE COURT REPORTER:  Hold on, Mr. Kiersh.

25             Did anybody have a hard time hearing him?

1          THE COURT:  No.  I was able to hear him.

2          THE COURT REPORTER:  Okay.  Where I lost you is, "We

3    give the government the benefit of the doubt as to what they

4    say ..."  do you want me to give you more context?

5          MR. KIERSCH:  You want me to repeat what I said after

6    that?

7          THE COURT REPORTER:  Yes, please.

8          MR. KIERSCH:  Okay.  Sure.

9          So, again, if we give the government the benefit of the

10   doubt in terms of what they were saying with respect to the

11   allegation in the pleading, the only activity that's -- that

12   is -- that Mr. Klein is accused of, that's wrongful, is

13   wrenching open a door.

14         Again, there's no violence against any individual, which

15   I submit to the Court is the key factor here, and distinguishes

16   his case from many of the other cases that have come before

17   different judges of the court.  Matthew Klein is not involved

18   in any physical confrontations whatsoever.

19         In our reply, I pulled up some other cases that have

20   been pending for the United States District Court for the

21   District of Columbia.  There are individuals who participated

22   in this with far more violent conduct, far more dangerous

23   conduct, far more provocative conduct that have been in release

24   pending trial because liberty is the norm.

25         We specifically cited *United States v. Klein*.  No

1    relationship to Matthew Klein.  That was recently, I believe it

2    was last Friday, decided by judge -- decided by Judge Bates.

3    And Judge Bates said that the defendant's conduct in that case,

4    he characterized it as troublesome and troubling and something

5    that clearly seemed to indicate violent conduct.  But then he

6    said that even though his conduct was troubling and revealed

7    propensity for violence, he, quote, shows his potential to live

8    a law-abiding life, end of quote.  And that clearly --

9    clearly -- is applicable to Matthew Klein, the person who is

10   before the Court this afternoon, Your Honor.  Everything

11   about --

12            THE COURT:  Let me offer you just the other way of

13   thinking about this, just so you have a chance to respond to

14   it.

15        Let me make sure I still have everybody here.  Is the

16   court reporter still there?

17            THE COURT REPORTER:  Yes, Judge, I'm here.  I'm on my

18   phone line.  I got kicked out so I'm on my phone line.

19            THE COURT:  Okay.  Thank you.

20        So I think the government says that he wasn't simply

21   present when the door was wrenched open but that he physically

22   broke through the -- a locked door and causing in excess of a

23   thousand dollars of damage, meeting on the other side of the

24   door Capitol police who were arranged there to try to protect

25   the building; that he did that while wearing goggles and put

1    goggles on in -- in -- goggles he brought with him, showing

2    that he actually planned some confrontation with hostile

3    forces, whether it be the police or counter-protesters.  He

4    appeared with the goggles, presumably, to keep pepper spray or

5    other substances like that out of his eyes so that he could

6    withstand efforts by the police to protect the building.

7         He was not somebody who just innocently wandered into

8    the building not knowing whether it was -- it was opened up or

9    not, but he actually physically broke down a door causing,

10   presumably -- causing damage and showing that he was not just

11   simply somebody who was wandering around but somebody who was

12   actually assaulting the Capitol.

13        And then on top of that -- and this, quite frankly,

14   causes me some concerns.  I would like to hear you respond to

15   it.  In a lot of these cases the courts, including myself --

16   you know, there's not any reason to think that this is an

17   individual who -- who engaged in any conduct like this outside

18   of the unique context of what was happening in

19   Washington, D.C., on that day.

20        But here the government has produced photographs of

21   Mr. Klein attending other protests, participating, presumably,

22   in confrontation with other protesters, Black Lives Matter

23   protesters.  You know, in one case -- and I find this

24   alarming -- carrying a baseball bat as he did -- as he did so,

25   and in another case with -- with a gun that was loaded in -- in

1    his vehicle he was in and, apparently, whether loaded or not,

2    was in his waistband.  And, again, wearing goggles.  And this

3    all looks like somebody who is expecting and inviting a

4    confrontation.

5         And whether it's simply for purposes of terrifying

6    the -- the other protesters or possibly bashing somebody over

7    the head, when you have somebody walking through a protest

8    carrying a baseball bat, that brings into mind the images of

9    some of the most disturbing types of -- of protests.

10        And this is not somebody who's purely exercising his

11   First Amendment right.  It appears, or at least arguably, to a

12   certain extent, in which somebody was -- was acting to dissuade

13   other people from exercising their First Amendment right and

14   was at least personally threatening to bash them over the head

15   with a baseball bat in that context and that -- or -- or

16   carrying a gun in that context.

17        And so I need to assure myself in light of the

18   presumption that applies here that Mr. Klein if released --

19   could not, you know, be released under any condition that would

20   reasonably assure the safety of the -- of the community.  How

21   do I -- how do I know that and do that?  I mean, I understand

22   that he has had a largely clean criminal record, having a clean

23   criminal record with just these charges pending against him.

24        But I also have photos that the government represented

25   to me are of a man at a protest carrying a baseball bat and

1    carrying a gun, which, you know, the -- you know, that -- I'm

2    at least concerned that he could attend protests back in

3    Oregon, getting in his car and coming all the way to Washington

4    again and getting involved in -- in a circumstance in which

5    somebody ends up seriously injured, if not killed.  That's my

6    concern.  I put that out so you can respond to it.

7              MR. KIERSH:  Thank you, Your Honor.

8         And I'll respond as follows:  The address that we

9    provided to the Court is at least three to four hours outside

10   of Portland, and it's a farm.  And that's where Mr. Klein would

11   go to reside with his aunt, his uncle, and, again, his mother

12   will move to the farm to ensure compliance with any conditions

13   of release.  He can be placed on an ankle monitor.

14        And another -- a condition of release is that he not --

15   that I -- we certainly would not object to is that he not

16   attend any other political rallies, whether it be left-wing

17   rallies or right-wing rallies or whatever.  And he'd be

18   virtually under house arrest.

19        We would like to see him get back and complete his

20   college program, but, primarily, he would be -- be required --

21   again, without any opposition -- to stay on the premises where

22   his family members can monitor his conduct and where, quite

23   frankly, pretrial can monitor his comings and goings.  This

24   will be on the monitor.

25              THE COURT:  But can I say with respect to that,

1    Mr. Kiersh, at a minimum, I think that what would have to

2    happen with respect to that is pretrial services, I think they

3    would have to, I think, evaluate whether the premises are

4    appropriate premises, whether his mother would be an

5    appropriate third-party custodian, and whether ankle monitoring

6    would be available in that area.  It would be -- at least

7    pretrial services would receive notice of the relevant

8    information so that they could do that investigation to let us

9    know whether all those conditions that you're proposing would

10   adequately work.

11          MR. KIERSH:  Yes.  I -- I can contact Oregon pretrial

12   services and speak with them and hopefully get confirmation

13   that they can, in fact, coordinate with D.C. pretrial services,

14   as well as this Court, to make sure that Mr. Klein is in full

15   compliance.

16          THE COURT:  Is there anything else, Mr. Kiersh, that

17   you wanted to add?

18          MR. KIERSCH:  Well, again, with respect to the Oregon

19   charges and the gun, again, it's a misdemeanor, and he's not

20   being held on that -- on that charge.  And it's -- it's

21   something that will resolve itself in due course, certainly

22   pending the outcome of these proceedings.

23          But I would ask the Court to look at the totality of

24   this person and not just in isolation of a few events that have

25   occurred, because he hasn't been charged with any type of

1    offenses with respect to attending those rallies.

2          These are -- what's been going on in this country with

3    respect to these rallies is very confusing, and it's still --

4    it's going to require a lot of sorting out as to what people

5    were doing, but he's -- right now he has not been charged with

6    any offense related to the rallies on the West Coast.  The

7    only --

8          THE COURT:  I just need -- I need to consider all the

9    evidence in front of me and be able to reach a conclusion that

10   if released that Mr. Klein could be subject to the conditions

11   of release that would protect the public and the community.

12   And I -- whether he was charged or not, I am concerned by the

13   fact that he brought a gun to a -- what appeared to be a

14   confrontational rally, going to a rally expecting confrontation

15   with it; a paint gun; wearing, you know, I think, a flak jacket

16   in one circumstance; goggles; carrying a baseball bat.  He was

17   not there to play baseball, by any means.  It was a weapon he

18   was carrying.

19          MR. KIERSH:  Understood.  With respect to the

20   goggles, I would submit to the Court that these rallies get out

21   of hand consistently very quickly, and when -- when the police

22   arrive at these rallies, they're going to be spraying pepper

23   gas and they're going to be spraying other things, irritants.

24   So going to one of these rallies wearing goggles, I would

25   submit to the Court, doesn't suggest that he's trying to incite

1   something.  It's just he's going in anticipation that police

2   might come and start spraying tear gas and he needs to protect

3   his eyes.  So I think that makes a fair amount of sense for him

4   to show up like that.

5         And, again, these -- when we compare some of the other

6   people -- and I understand the Court is looking at -- at

7   Mr. Klein individually, but we have a man -- with respect -- in

8   front of Judge -- Judge Bates who brought bear spray into the

9   United States Capitol.  That's -- that's a real serious

10  irritant that can cause permanent eye damage.  Judge Bates

11  says:  Well, he does have a lot of characteristics showing that

12  he can be a law-abiding person.

13        And we would submit the very same with respect to

14  Mr. Klein who was not -- who did not bring any -- any such

15  irritants into the Capitol.  He just -- he was there and things

16  got out of hand.  And, again, that evidence needs to be sorted

17  out, and we need to go through -- there's a lot of evidence,

18  review that's going to have to be done to figure out how we're

19  going to counter that.  But in the context of the other people

20  who were present and the context of other individuals who

21  clearly were involved with more violent conduct at the Capitol

22  on January 6th, we submit Mr. Klein is a good candidate.

23        And I will contact Oregon pretrial services to see if

24  they can confirm that they can follow him.

25              THE COURT:  All right.  Thanks.  Well, let me hear

1    from Mr. Veatch, and then I'll give you an opportunity to

2    respond.

3            MR. VEATCH:  Thank you, Your Honor.

4        A couple things that I just need to clarify.  I believe

5    counsel is -- is confusing the two cases that they cited,

6    *United States v. Schaffer* and the *United States v. Klein*.  The

7    *Schaffer* --

8            THE COURT:  I -- I recognize that, Mr. Veatch.  The

9    bear spray was not in *Klein*.

10           MR. VEATCH:  And, more importantly, with the *Schaffer*

11   case that involved the bear spray, it was neither discharged

12   nor was the defendant released from custody until there was a

13   plea agreement entered into, which, in fact, was a cooperation

14   plea agreement.  And as part of that agreement, the government

15   agreed to not contest release.  So that's an entirely different

16   case than the one in front of Your Honor.

17       And even if it were not, the two cases that the

18   defendant cites to are easily distinguishable in this case,

19   which the conduct that we're talking about here is exactly what

20   *Munchel* was referring to -- the Court in *Munchel* was referring

21   to where you have specific, articulable facts beyond the -- the

22   opportunity and the dangerousness that occurred as a result of

23   January 6th that was limited to the opportunity there where you

24   do have a defendant -- and who is not -- a defendant who is not

25   merely a sightseer, if you will, in the Capitol, Your Honor.

1     You have a defendant who --

2          And there's no conflation between Matthew Klein and

3     Jonathan Klein.  Matthew Klein's conduct was far worse than

4     Jonathan Klein, and there's been no attempt to try to conflate

5     the two.  You have Matthew Klein who is the one assisting

6     people to scale the wall on the west side of the Capitol

7     Building, Your Honor, to assist them with gaining access.

8     There's no allegation like that against Jonathanpeter.  You do

9     have Matthew Klein entering the Capitol walking around, but

10    that's not the only conduct that occurs.

11         It is then after he and his brother leave -- in the case

12    of Matthew Klein, he leaves -- in an area that has been

13    overwhelmed by law enforcement, he then leaves through a

14    window, but then he and his brother regroup to then try to

15    wrench open a door.  The two of them snap open a door,

16    essentially, behind which is law enforcement.  And unlike

17    Matt- -- Jonathanpeter who then walked away, Matthew then puts

18    on his goggles, dons his -- puts out his flag, and -- and

19    confronts law enforcement.  I'm not sure what the message was.

20    He was then -- almost immediately then sprayed.

21         So, yes, that does happen at rallies when you break open

22    doors and confront law enforcement.  But -- but that's --

23    unlike his brother who just merely walked away, Matthew decided

24    to confront law enforcement in that position, knowing full well

25    everything that had gone on that day and as part of a second or

1        third wave of attacks on the Capitol that afternoon.

2                THE COURT:  Can I ask you a question?  I have in

3        front of me on page 7 of your opposition brief a photograph of

4        the wrenching open of the door.  And it looks to me as though

5        what we see is Matthew's brother standing at the door and

6        Matthew in the photograph is standing behind him.  Do you have

7        videotape or something else to confirm?

8                MR. VEATCH:  I do, Your Honor.  And it's very, very

9        quick, and I'm happy to play it for the Court if we can work

10       out the -- the -- but what you'll see is in a split second, as

11       if it's the two are rocking together and spring the door.  So

12       you'll see Matthew moving with his brother.  So it appears that

13       Matthew's got an arm possibly on the handle as well, but I'm

14       happy to tee that up, Your Honor.

15               THE COURT:  If you could do that without our --

16       having technical difficulties, that would be good.

17               MR. VEATCH:  And then I'm happy to play part two of

18       the video.  Let me do a share screen.

19               THE COURT:  All right.  I can see your screen now.

20               MR. VEATCH:  Okay.  So let me -- so I would ask that

21       the parties focus in on the middle bottom portion of the screen

22       now.  I'll tee this up.

23               THE COURT:  Mr. Veatch, if you're having difficulty,

24       you can submit these clips to the Court.

25               MR. VEATCH:  I'm sorry, Your Honor.  Were you saying

1    something?

2            THE COURT:  I said if you're having difficulty with

3    this, you can, after the hearing, submit these clips to the

4    Court, and I'll review them.

5            MR. VEATCH:  Will do, Your Honor.  Are you -- I

6    apologize.  Are you able to see the video?

7            THE COURT:  I can just see your -- your -- your

8    screen, and I can see -- there's a video that's set to be cued,

9    but it's not playing for me.

10            MR. VEATCH:  Hold on.  If I may, Your Honor, let me

11    just try one more thing here.

12            THE COURT:  Okay.  There we go.

13            MR. KIERSH:  I have it also on my screen.

14            MR. VEATCH:  Great.  Thank you.

15        And, again, it's the very beginning second or two,

16    the -- the middle and bottom left of the screen.  There's a

17    second video, if I may.  It's equally short.

18            THE COURT:  Unfortunately, Mr. Veatch, I did not see

19    at the beginning of this video Matthew involved in the door.

20    So you may have to go back to the beginning of that video to

21    see that.

22            MR. VEATCH:  Sure, Your Honor.  And I apologize.

23    It's at the very, very, very front end of this.  Your Honor, do

24    you have a video right now where you can see --

25            THE COURT:  I see a bar jammed in the door.

```
1                    MR. VEATCH:  Yes.

2                    THE COURT:  And I see Matthew's brother.  I don't see

3       Matthew.

4                    MR. VEATCH:  The green shoulder, Your Honor, is

5       the -- is Matthew Klein.  You'll see his face -- this is where

6       those stills were taken that are in our brief, Your Honor.

7       You'll see it's very, very quick.

8                    THE COURT:  Okay.

9                    MR. VEATCH:  But you'll see him moving in conjunction

10      with his brother.

11                   THE COURT:  Okay.  He's not the one wearing the

12      helmet?  That's somebody else; right?

13                   MR. VEATCH:  That's somebody else.  Yes, Your Honor.

14                   THE COURT:  Can you go back again, because I still

15      don't see it.  You may need to -- can I ask you to submit this

16      to the Court --

17                   MR. VEATCH:  Yes, Your Honor.

18                   THE COURT:  -- because I want to view this myself.  I

19      don't think I can do this quickly during the hearing.

20                   MR. VEATCH:  Yes, Your Honor.

21                   THE COURT:  Okay.

22                   MR. VEATCH:  And then if I may just show the other.

23                   THE COURT:  Yes, you may.

24                   MR. VEATCH:  Your Honor, if I'm going to submit the

25      one, we'll just submit them both.  This -- the other one will
```

1    just show where the defendant then gets -- positions himself in

2    front of the doorway as the police officers then come pouring

3    through.  He's then sprayed with a chemical spray as well.

4         We also believe that it fairly easily shows that he is

5    also wearing body armor as well as he was in the other rallies

6    that we pointed to.  For example, I'm sharing an image -- does

7    the Court and parties -- do you see the red, white, and blue

8    bandana on the head of an individual with a green coat?

9              THE COURT:  We do.

10             MR. VEATCH:  And, Your Honor, we would argue that,

11   again, Mr. Klein is a fairly fit but svelte individual; that

12   this poofiness to Mr. Klein, distinctive rectangle shape in his

13   back, as well as the fact that he wore armor at the other two

14   rallies we cited to, would indicate that he came not just with

15   goggles but with some sort of tactical vest to protect, body

16   armor.

17             THE COURT:  I can see that.  Thank you.

18             MR. VEATCH:  So, Your Honor, we -- when -- when the

19   Court gets the chance to review the video, we believe it would

20   show -- and, again, we have -- and it's fortuitous that a

21   member of the media took that picture -- or that video, and,

22   unfortunately, we don't have a lengthy part of it, but what we

23   do have is when it is slowed down or when Your Honor is able to

24   view it in a more controlled manner, you'll see the two

25   defendants wrenching the door together, acting in unison to pop

1    that door open and recognizing that they are surrounded by

2    other angry individuals who are attempting to gain access back

3    into the Capitol Building.

4         Your Honor, that's why we believe this -- this falls

5    squarely within what *Munchel* was talking about when you're

6    talking about individuals who break open doors and windows or

7    create opportunities for assaults on law enforcement.

8         THE COURT:  Do you agree that during the earlier

9    rally that it appears that Mr. Klein was carrying a baseball

10   bat?

11        MR. VEATCH:  Oh, in -- in the rallies in Oregon, yes,

12   Your Honor.  And that's -- and that was -- the -- the -- we

13   wanted to bring to your attention, which is why this is

14   distinguishable from the -- the *Federico Klein* case, for

15   example, where you have an individual who's had positions of

16   respect and authority, a trusted authority, with a top secret

17   clearance.

18        Of course, the relatively short history we have of the

19   defendant in this case since his return to the United States,

20   that has involved these scenarios where he is -- appears to

21   have gone looking to engage in violence.  And we've quoted in

22   our brief with regard to the incident where he was arrested

23   leaving a Proud Boys rally, and we agree we're not arguing that

24   the defendant himself is a Proud Boy.  However, he is certainly

25   Proud Boy adjacent in the various photos that we've seen, not

1    that that in and of itself is a crime.  It is not.

2              THE COURT:  Do you agree he had a gun in the back of

3    his pants?

4              MR. VEATCH:  We do, Your Honor, and we -- at the

5    Proud Boy rally itself, it does look like it's unloaded.

6    However, we don't know where the magazine is for that firearm.

7              THE COURT:  All right.

8              MR. VEATCH:  But -- and as to quote the officer who

9    observed him and his brother and others leaving the rally where

10   the defendant was charged, he said he believed the occupants to

11   the bed of the truck were not positioned in a reactive or

12   defensive posture but were looking to initiate a response from

13   and are acting violently towards those they perceived to be

14   counter to their ideals.  And that would be, you know, this

15   image -- or appears consistent with the image of the defendant

16   and the other individuals in this truck with shields with

17   paintball guns leaving the rally.

18             THE COURT:  All right.  Thank you.  Anything further?

19             MR. VEATCH:  Yes, Your Honor.  The -- if the

20   defendant is referring to the Sherwood Farm as the place he

21   would go live -- and I -- Defense Counsel, I don't know what

22   address or what farm you're referring to -- that's only 30

23   minutes from Portland.

24        And we would add that all the factors that were in place

25   when this other conduct occurred were already in place.  He was

1    a college student.  He knew exactly the risks that were going

2    to occur if he got involved with something like this.  He also

3    had a pending firearm charge.  He also lived with his aunt and

4    uncle on a farm, and he had close family.

5         So these are all factors that were already in place, yet

6    the defendant engaged in this conduct and appeared ready,

7    willing, and able to engage in further conduct.

8         THE COURT:  All right.  Thank you.

9         Mr. Kiersh, do you want to respond?  I can give you five

10   or ten minutes.

11        MR. KIERSH:  Thank you.

12        Number one, it's -- the parties agree that the gun that

13   is being referenced in our -- this -- this was an unloaded gun

14   and --

15        THE COURT:  I'm not sure that's what the government

16   is saying.  They're saying, the government, it appears not to

17   be loaded, but he doesn't -- the government doesn't know where

18   the clip was.  It could have been in his pocket.  We just don't

19   know.

20        MR. KIERSH:  Right.  But -- but the clip was not in

21   the gun.  I believe everybody agrees with that.

22        And with respect to his living conditions, well, he may

23   have been living at that farm before, but now he's -- now he's

24   facing very serious felony -- federal felony charges, and so

25   he -- he's much more aware of the need for him to abide by

1    conditions of release because of the nature of the charges

2    against him.

3         I want to go back to *Schaffer* and *Klein* for a second.

4    And I appreciate the -- the factual distinction and the factual

5    correction.  But in *Klein* -- again, Klein not being related to

6    this Matthew Klein but the one in front of Judge Bates.

7         THE COURT:  Understood.

8         MR. KIERSH:  Judge Bates specifically noted that the

9    Klein in that case was engaged in a -- what he called a

10   coordinated effort to wedge a riot shield to push open a

11   closing door.  I mean, that's as similar as can be to what we

12   have in this case and --

13        THE COURT:  Not -- not quite as similar.  I mean,

14   I -- I understand it's similar, but what's missing there is the

15   actual damage to federal property which triggers the

16   presumption.

17        MR. KIERSH:  I understand that, but what -- but to me

18   what I take the importance of that is that Judge Bates said

19   that what he characterized -- or how he characterized that

20   action is spur of the moment, and it didn't demonstrate

21   coordination such as was present in other cases.

22        And I would submit to the Court, that's exactly what we

23   have here with Matthew Klein.  We look at that video, and the

24   video can be interpreted many different ways, but for purposes

25   of argument, if we accept the government's interpretation of

1   it, this is not coordination.  This is just simply people

2   responding to the President of the United States saying go down

3   to the Capitol.  There's a mass rush into the Capitol, and

4   people are just taking all sorts of action.

5          But Matthew Klein is not involved in any type of

6   coordinated effort.  There's no evidence other than the fact

7   that he traveled to the District of Columbia and was hanging

8   around with his brother.  There's no evidence that he's

9   involved with any other person, any other group, any other

10  entity or involved in any other type of coordination to enter

11  the premises of the Capitol.  And it's that lack of

12  coordination, which I submit to the Court, demonstrates that he

13  is a person who can abide by conditions of release, however

14  restricted they are, but at least to get him out of the -- out

15  of the jail in Oregon and let him go back to reside at the

16  address with his aunt and uncle or any other address that

17  pretrial services deems appropriate.

18         And, again, in -- in the overall context of what we have

19  here and the nature of the serious charges he's now facing, he

20  has every incentive not to participate in rallies, not to go to

21  rallies, not to participate in any type -- or possession of a

22  weapon -- or any other type of potentially violent conduct.

23  He'll stay out of the District of Columbia.  He lives all the

24  way across the country.

25         So for all those reasons, we would submit that

1    instituting conditions of release are appropriate.

2              THE DEFENDANT:  Your Honor --

3              THE COURT:  Yes.

4              THE DEFENDANT:  -- could I get a breakout room with

5    my attorney for a minute?  Would that be okay?

6              THE COURT:  You can.  I've got another call in nine

7    minutes, but I'm pleased to do so.  So I think what you can do

8    is maybe mute whatever -- your microphone there, and hopefully

9    you can talk separately to Mr. Kiersh.

10             THE DEFENDANT:  Okay.  Thank you.

11             THE COURTROOM DEPUTY:  Your Honor, just for sake of

12   technical issues, if Mr. Kiersh could call Mr. Klein and they

13   both mute their video.  It's a little risky with the breakout

14   rooms.

15             MR. KIERSH:  I will call Mr. Klein.  I don't know if

16   this is the period of time during the day that the jail will

17   actually connect me to him.

18             THE COURTROOM DEPUTY:  No.  You would have to have

19   Mr. Klein give you the phone number there in the room that he's

20   in.  And the Marshals Service will have to help you, Mr. Klein,

21   with that phone number, the number that you should call on,

22   that Mr. -- that your attorney should call on.  I'm sorry.

23             MR. KIERSH:  Okay.

24         Mr. Klein, did you hear that?

25             THE DEFENDANT:  Yes, I did.

```
 1              MR. KIERSH:  Okay.  So can you give me the number to
 2      call?
 3              THE U.S. MARSHAL:  Why don't you give me your number,
 4      Mr. Kiersh, and we'll call you.
 5              MR. KIERSH:  That's fine.  It's area code
 6      XXX-XXX-XXXX.
 7              THE U.S. MARSHAL:  Okay.
 8              MR. KIERSCH:  Thank you.
 9              (Off the record.)
10              THE COURT:  All right.  Mr. Kiersh.
11              MR. KIERSH:  We're ready to proceed.
12              THE COURT:  Anything else you wanted to add?
13              MR. KIERSH:  Yes, just a couple of clarifications.
14          If released, Mr. Klein would live with his mother and
15      father, and they live in Baker City, Oregon, at XXX XXXXX --
16              THE U.S. MARSHAL:  I'm sorry.  We don't have
17      Mr. Klein back on yet.
18              MR. KIERSH:  Okay.  We'll wait.
19              THE COURT:  Hold on one second.  Thank you.
20              (Off the record.)
21              THE U.S. MARSHAL:  Now we have to be admitted,
22      please.
23              THE COURT:  All right.  Kristin.
24              THE COURTROOM DEPUTY:  Your Honor, what's the issue?
25              THE COURT:  He said he needs to be admitted.
```

1          Can you hear us?

2                    THE U.S. MARSHAL:  Hello.

3                    THE COURT:  Mr. Klein, can you hear me?

4                    THE DEFENDANT:  Yes, sir.  Yes, Your Honor.

5                    THE COURT:  All right.  So go ahead, Mr. Kiersh, but

6     let me ask you just to not give the specific house number for

7     security reasons on the public line here, but you can give that

8     number and that information to pretrial and the government.

9                    MR. KIERSH:  Very well.  If released, Mr. Klein would

10    live with his parents who live in Baker City, Oregon, which is

11    about -- it's between 4.5 to 6.5 hours, depending on which way

12    you drive, from Portland.  And, again, I -- I would reiterate

13    that his parents are deeply -- deeply religious people.

14    They're Christian missionaries.  Mr. Klein grew up in that

15    environment.  He lived with his parents for a number of years

16    in South America.  He came back up here.  That's when he

17    resided with his aunt and uncle.  That's when he attended

18    college.  His parents are very responsible people.  They own

19    their home, and, again, they will provide whatever supervision

20    is deemed necessary and appropriate for Mr. Klein.

21         I do want to address the issue with the baseball bat.  I

22    want to point out that these rallies that we're talking about,

23    they get out of hand very quickly.  And people on both sides,

24    right wing and left wing, start throwing things, dangerous

25    things.  And if Mr. Klein was in possession of a baseball bat,

1    it was purely for defensive purposes.  He did not want to be

2    hit by any object that was being thrown by anybody, whatever

3    side of the fence they were on.  He never used the baseball bat

4    in any type of affirmative or aggressive manner.  It was simply

5    for his own protection.

6         And, really, the same thing with the goggles; in that

7    because these -- these rallies get out of hand and tear gas is

8    being used by police or -- or whomever, the goggles protect him

9    from -- his eyes, but they are not used in any type of

10   affirmative or aggressive manner.

11        And other than that, we would submit on the record.

12             THE COURT:  All right.  Well, thank you.

13        So this is what I -- I'm going to do.  I would like to

14   see the videotape from the government.  I'll have you submit

15   that.

16        Mr. Kiersh, I would like you to confirm with whether

17   pretrial services here, in D.C. -- I'd like the views of

18   pretrial services with respect to your proposed conditions of

19   release, whether they can do some type of GPS monitoring,

20   whether they think that Mr. Klein's mother is an appropriate

21   third-party custodian under these circumstances.  I'd like the

22   parties to submit that information to the Court.  And,

23   Mr. Klein -- Mr. Kiersh, how quickly can you do that?

24             MR. KIERSH:  If I could do it by Thursday close of

25   business, I think that will leave me enough time.

1          THE COURT:  So I'll direct that both the government

2     and the -- the defense provide additional information by the

3     close of business on Thursday, the 22nd.  If you can do it

4     sooner, all the better.  I will review that.

5          And then if I am inclined to think that some form of

6     pretrial release, subject to a third-party custodian, is

7     appropriate, I'm going to want to reconvene at that point in

8     time, and I'm going to want to get Mr. Klein's mother on the

9     telephone.  And I'd like to have her on the line and have a

10    conversation with her as well.

11         MR. KIERSH:  That would be fine.  While we're

12    together, can I get the name and number for D.C. pretrial's

13    person?

14         THE COURT:  Pretrial.

15         THE PRETRIAL SERVICES OFFICER:  Yes, you can.  When

16    do you think you'll have the information available?

17         MR. KIERSH:  I have to contact the authorities in

18    Oregon, and I'll get working on that right away, but I hope to

19    have it by 24 hours from now.

20         THE PRETRIAL SERVICES OFFICER:  No.  Typically we

21    would reach out to Oregon to see if they're willing to courtesy

22    supervise him, and we would take on those things.  So if you

23    can send your proposed conditions to myself -- you can give me

24    a call at XXX-XXX-XXXX, if you're -- if you plan on doing it

25    today.  If not today, tomorrow you will need to call our main

1    number and ask to speak to the duty officer, and that number is

2    202-442-1000.

3              MR. KIERSH:  Okay.  Can I get your full name, please.

4              THE PRETRIAL SERVICES OFFICER:  It's Da'Shanta',

5    D-a-S-h-a-n-t-a, Valentine, V-a-l-e-n-t-i-n-e, hyphen, Lewis,

6    L-e-w-i-s.

7              MR. KIERSH:  Thank you.  And I'll give you a call

8    right after we get off the phone and we can -- right after we

9    get off this meeting.  Excuse me.

10             THE PRETRIAL SERVICES OFFICER:  Okay.

11             THE COURT:  Okay.  Well, thank you, all, then.  And I

12   will consider the additional materials.  And if I need to

13   reconvene, I'll let you know.

14             (The proceedings concluded at 4:03 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1                CERTIFICATE OF OFFICIAL COURT REPORTER

2

3            I, Nancy J. Meyer, Registered Diplomate Reporter,

4     Certified Realtime Reporter, do hereby certify that the above

5     and foregoing constitutes a true and accurate transcript of my

6     stenograph notes and is a full, true, and complete transcript

7     of the proceedings to the best of my ability.

8

9                         Dated this 22nd day of April, 2021.

10

11                         /s/ Nancy J. Meyer
                            Nancy J. Meyer
12                          Official Court Reporter
                            Registered Diplomate Reporter
13                          Certified Realtime Reporter
                            333 Constitution Avenue Northwest, Room 6509
14                          Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25