UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>MATTHEW LELAND KLEIN,<br><br>*Defendant.* | Criminal Action No. 21-237 (RDM) |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant Matthew Leland Klein's Motion for Bond and Institution of Conditions of Pretrial Release. Dkt. 13. Klein was arrested on March 23, 2021 for his role in events at the United States Capitol on January 6, 2021. He was ordered detained pending trial by Magistrate Judge John V. Acosta of the United States District Court for the District of Oregon and now moves for an order releasing him to the supervision of a third-party custodian, subject to certain conditions including location monitoring.

For the reasons that follow, the Court will **DENY** without prejudice Klein's Motion for Bond and Institution of Conditions of Pretrial Release.

**I. BACKGROUND**

The following background is taken from the government's charging instruments, the parties' briefing, and the exhibits tendered to the Court thus far. It does not represent the Court's findings of fact on the merits of the case, which are the province of the jury.

In December 2020, plans to protest Congress' certification of the Electoral College vote in the 2020 election began to form. Dkt. 1 at 3 (Indictment ¶ 8). In late December, Klein and his brother—co-defendant JonathanPeter Allen Klein—"obtained airline tickets to travel from

1

Portland, Oregon, to Philadelphia, Pennsylvania, on January 4, 2021." *Id.* (Indictment ¶ 10); *see also* Dkt. 14 at 8.  By January 6, 2021, the pair had travelled from Philadelphia to Washington, D.C., and, on the afternoon of January 6 itself, they joined "a large crowd [that] began to gather outside the Capitol perimeter." Dkt. 1 at 4 (Indictment ¶ 13).  That same afternoon, "[c]rowd members, including [the Klein brothers] eventually forced their way through, up, and over additional Capitol Police barricades and advanced to the [Capitol] building's exterior façade." *Id.* (Indictment ¶ 18).  Although "Capitol Police officers attempted to maintain order and stop the crowd from entering the Capitol building," "crowd members had begun to force entry into the Capitol building by breaking windows and forcing open doors." *Id.* (Indictment ¶ 19).

"At 2:11 p.m., [Klein began] assist[ing] members of the crowd, who had breached the Capitol's restricted grounds, with using a police barricade to climb a wall and gain access to an external stairwell leading to the Upper West Terrace of the Capitol." *Id.* at 7 (Indictment ¶ 28).  Seven minutes later, "[a]t 2:18 p.m., [Klein] entered the Capitol building [using a] . . . door on the northwest side of the Capitol." *Id.* (Indictment ¶ 30).  Klein and his brother remained in the Capitol building for roughly ten minutes and then exited. *Id.* (Indictment ¶ 32); *see also* Dkt. 14 at 5–6.  "After exiting the Capitol, [Klein and his brother] worked in coordination to forcibly open a secured door on the Capitol's north side." Dkt. 1 at 7 (Indictment ¶ 32).  Behind that door were a host of federal law enforcement officers, visible to the Klein brothers as they attempted their breach.  *Id.*  Klein and his brother succeeded in wrenching open the secured door.  *Id.*  Law enforcement responded to the breach by deploying what appears to be pepper spray,[1] but Klein, after donning protective goggles, *id.* (Indictment ¶ 33), "advanced toward the law enforcement

---

[1] On April 20, 2021, the government submitted via email to the Court and defense counsel a series of short videos depicting these events.

officers and used a Gadsden flag affixed to a flagpole to interfere with efforts by law enforcement to disperse the crowd," *id.* (Indictment ¶ 34); *see also* Dkt. 14 at 7.

Over one month later, on March 19, 2021, Klein and co-defendant JonathanPeter Allen Klein (Klein's brother) were indicted by a grand jury on six counts: conspiracy to violate 18 U.S.C. § 1512(c)(2) (obstruction of an official proceeding) and § 231(a)(3) (obstruction of law enforcement during a civil disorder), in violation of 18 U.S.C. § 371; obstruction of an official proceeding and aiding and abetting, in violation of 18 U.S.C. §§ 1512(c)(2); obstruction of law enforcement during civil disorder and aiding and abetting, in violation of 18 U.S.C. § 231(a)(3); destruction of government property and aiding and abetting, in violation of 18 U.S.C. §§ 1361, 62; entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1); and disorderly and disruptive conduct in a restricted building, in violation of 18 U.S.C. § 1752(a)(2).  Dkt. 1 at 5–10 (Indictment ¶¶ 23, 35–44).

Four days after he was indicted, Klein was arrested in the District of Oregon and appeared before Magistrate Judge John V. Acosta, who ordered that the defendant be detained as both a risk of flight and a danger to the community.  On March 26, 2021, Klein had an initial appearance in this district before Magistrate Judge Zia M. Faruqui who, among other things, granted Klein's motion to appoint counsel.  *See* Minute Entry (Mar. 26, 2021).  On April 1, 2021, Klein and his brother appeared before the undersigned and were arraigned, pleading not guilty to all counts.  *See* Minute Entry (Apr. 1, 2021).  Eight days later, on April 9, 2021, Klein filed the instant Motion for Bond and Institution of Conditions of Pretrial Release, Dkt. 13.  The government responded to the motion, Dkt. 14, and Klein filed his reply, Dkt. 17.  On April 20, 2021, the Court held a hearing on Klein's motion.  *See* Minute Entry (Apr. 20, 2021).  The following day, Klein submitted proposed conditions of his release which included, most

saliently, a request that Klein's parents serve "as third-party custodians throughout the duration of the proceedings." Dkt. 19 at 2. The government filed its opposition to Klein's proposed conditions, arguing that "the defendant's parents [were] ill-suited to be" third-party custodians because they "were aware if not supportive of at least [Klein's brother's] unlawful entry to the U.S. Capitol Building on January 6, 2021"; because they had "warned [Klein's brother] to not discuss such conduct with anyone to avoid being "caught"; and because Klein's mother had advised Klein's brother "to delete his phone's data"—that is, in the government's view, to "destroy potential evidence." Dkt. 22 at 1. In response, Klein filed two supplemental briefs advising the Court of at least six other potential third-party custodians. Dkt. 23; Dkt. 24. Klein's counsel had not cleared any of these third-party custodians with Pretrial Services, however.

At this point, Klein's Motion for Bond and Institution of Conditions of Pretrial Release, Dkt. 13, is ripe for decision.

## II. LEGAL STANDARD

Under 18 U.S.C. § 3145(b), a defendant ordered detained by a magistrate judge may file "a motion for revocation or amendment to the order" with "a court having original jurisdiction over the offense." 18 U.S.C. § 3145(b). Although the D.C. Circuit has yet to opine on the question, *see United States v. Munchel*, 991 F.3d 1273, 1280 (D.C. Cir. 2021), substantial precedent supports the view that a magistrate judge's detention order is subject to *de novo* review by the district court, *see United States v. Hunt*, 240 F. Supp. 3d 128, 132–33 (D.D.C. 2017) (identifying cases supporting this proposition from the Second, Third, Fourth, Fifth, Sixth,

Seventh, Eighth, Ninth, Tenth, and Eleventh Circuits), and this Court has adopted that view, *United States v. Taylor*, 289 F. Supp. 3d 55, 66 (D.D.C. 2018).

The Bail Reform Act permits pretrial detention in only "carefully defined circumstances." *United States v. Simpkins*, 826 F.2d 94, 95–96 (D.C. Cir. 1987).  The question for the Court is whether any "condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e).  If not, the Court "shall order the detention of the [defendant] before trial."  *Id.*  In determining whether Klein should be detained, the Court must consider: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.  *Id.* § 3142(g).  "The facts the judicial officer uses to support a finding . . . that no condition or combination of conditions will reasonably assure the safety of any other person and the community [must] be supported by clear and convincing evidence," and the government bears the burden of proof as to that evidence.  *Id.* § 3142(f)(2)(B).  That is because "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987); *see also Taylor*, 289 F. Supp. 3d at 62 ("The default position of the law . . . is that a defendant should be released pending trial.") (internal quotation marks and citation omitted).

With this said, the default rule "is modified . . . for certain[] particularly dangerous defendants."  *Id.* (internal quotation marks and citation omitted).  In particular, the Bail Reform Act creates a rebuttable presumption "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if . . .

5

there is probable cause to believe that the person committed" one of an enumerated list of crimes, including, as relevant here, "an offense listed in [18 U.S.C. § 2332b(g)(5)(B)] for which a maximum term of imprisonment of 10 years or more is prescribed." 18 U.S.C. § 3142(e)(3). For purposes of making that determination, "[a] grand jury indictment, by itself, establishes probable cause to believe that a defendant committed the crime with which he is charged." *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010); *see also United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996) ("[T]he indictment alone would have been enough to raise the rebuttable presumption that no condition would reasonably assure the safety of the community.").

Once triggered, "the presumption operate[s] . . . to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption." *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985). "While the burden of production may not be heavy," *United States v. Lee*, 195 F. Supp. 3d 120, 125 (D.D.C. 2016) (citations omitted), the defendant must proffer "at least some evidence" or basis to conclude that the case falls "outside 'the congressional paradigm'" giving rise to the presumption. *Stone*, 608 F.3d at 945–46 (quoting *United States v. Jessup*, 757 F.2d 378, 387 (1st Cir. 1985)); *see also United States v. Bess*, 678 F. Supp. 929, 934 (D.D.C. 1988) (finding that the presumption "represents Congress's general factual view about the special flight risks and the special risks of danger to the community presented by defendants who commit the crimes to which it attaches"). The defendant's burden, moreover, is just a burden of production; the burden of persuasion remains with the government throughout the proceeding. *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001); *see also Alatishe*, 768 F.2d at 371 n.14 (citing *Jessup*, 757 F.2d 378, but not deciding the question).

As then-Judge Breyer explained in an opinion that the D.C. Circuit has described as "scholarly" and "extremely compelling it its rationale," *Alatishe*, 768 F.2d at 371 n.14, the presumption is not a "bursting bubble" that becomes devoid of all force once a defendant has met his burden of production, *Jessup*, 757 F.2d at 382.  The presumption does "not vanish upon the introduction of contradicting evidence," nor does the burden of persuasion shift to the defendant. *Id.* at 383 (citation omitted).  Rather, even after a defendant carries his burden of production, the judicial officer must "keep in mind the fact that Congress has found that" those charged with the specified offenses are likely to pose a danger to the community. *Id.* at 384.  In short, "the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court." *Mercedes*, 254 F.3d at 436.

### III. ANALYSIS

**A.    Probable Cause and Presumption**

As an initial matter, the Court agrees with the government's contention that the presumption that no pretrial release conditions will reasonably assure the safety of the community was triggered by Klein's indictment.  Recall that, as relevant here, the presumption is triggered if "there is probable cause to believe that the person committed . . . an offense listed in [18 U.S.C. § 2332b(g)(5)(B)] for which a maximum term of imprisonment of 10 years or more is prescribed."  18 U.S.C. § 3142(e)(3).  Here, Count Four of the indictment charges Klein with destruction of government property valued at $1,000 or more, in violation of 18 U.S.C. § 1361.  Section 1361, in turn, is listed as an offense in § 2332b(g)(5)(B).  In addition, § 1361 provides that "[i]f the damage or attempted damage to such property exceeds the sum of $1,000," any person convicted under § 1361 "shall be punished . . . by a fine under this title or imprisonment for not more than ten years."  The presumption criteria in § 3142(e)(3)(C) are thus met—Count 4

is "an offense listed in [18 U.S.C. § 2332b(g)(5)(B)] for which a maximum term of imprisonment of 10 years . . . is prescribed." Because the indictment is sufficient to establish the last requirement for purposes of invoking the presumption—probable cause that Klein committed the predicate offense—*Smith*, 79 F.3d at 1210, the Court concludes that the presumption that no pretrial release conditions will reasonably assure the safety of the community applies here.

But that said, the Court finds that Klein has come forward with sufficient evidence to meet his burden of production, overcoming but not "bursting" the presumption. Klein stresses, for example, that he has lived away from home at college "for three years with no incidents of bad conduct;" that he has never previously been convicted of any crime; that he did not brandish or carry a weapon of any kind on January 6; and that he did not assault or cause physical harm to any person on January 6. Dkt. 13 at 2–3. The Court concludes that Klein has met his modest burden of production and that, as a result, "the Court must . . . consider all of the factors set forth in section 3142(g)" to determine whether detention is warranted. *Hunt*, 240 F. Supp. 3d at 133.

B.   **Nature and Circumstances of the Offense**

The Court first turns to the nature and circumstances of Klein's alleged offenses, which weigh in favor of his detention. Klein, along with hundreds of others, took over the United States Capitol; caused the Vice President of the United States, the Congress, and their staffs to flee the Senate and House Chambers; and delayed the solemn process of certifying a presidential election. Klein is charged with conspiring "to corruptly stop, delay, or hinder Congress's certification of the Electoral College vote" and "to obstruct and interfere with law enforcement officers engaged in their official duties to protect the Capitol and its occupants from those who had unlawfully advanced onto Capitol grounds." Dkt. 1 at 6 (Indictment ¶ 25). "This was a

singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021).

By wrenching open a secured door to the Capitol building, moreover, Klein placed the law enforcement officers who stood behind it at grave risk. As video footage of the events reveals, moments after Klein forced the door open, the crowd erupted in screams. In the now-open doorway, one man menacingly shook a black baton, while another crept toward the police bellowing "traitor, traitor." Two men then tried to rip the door off its hinges. Klein, too, was not done. When law enforcement finally emerged from the building, he donned protective goggles, stood intrusively in the doorway with a Gadsden flag raised, and tried to frustrate their attempt to restore order. And, even if Klein had no intention of personally assaulting the officers, he breached the one barrier that separated them from a hostile mob. And those officers, in turn, were there to protect the Congress and the democratic process from violent attack. *Cf. Munchel*, 991 F.3d at 1284–85 ("It cannot be gainsaid that the violent breach of the Capitol on January 6 was a grave danger to our democracy . . . .").

To be sure, there is no evidence at this time that other rioters used the door that Klein broke open to enter the Capitol building or that Klein's actions precipitated specific acts of violence or the death or injury of any person. But that is more a product of fortune than fate. Klein's alleged crimes were undoubtedly serious, and his actions posed an acute risk to the well-being of many innocent people. Klein and other rioters, moreover, succeeded in their efforts of using brute force to delay (if not stop) the most revered of democratic processes from proceeding. This was not an exercise of free speech but, to the contrary, an effort to quash the collective voice of the American electorate. The nature and circumstances of Klein's offense,

9

accordingly, weigh in favor of pretrial detention.  *Cf. Salerno*, 481 U.S. at 748 ("[I]n times of war or insurrection, when society's interest is at its peak, the Government may detain individuals whom the government believes to be dangerous.").

## C.     Weight of Evidence Against the Defendant

The second factor—the weight of evidence against the defendant—also weighs in favor of detention.  The government's evidence of Klein's guilt involves "videos and images of his conduct on January 6th, travel records, and items from the defendant and his co-defendant's online [social media] accounts."  Dkt. 14 at 19.  In light of the strength of the government's evidence against Klein, the second factor also weighs against his release.

## D.     History and Characteristics of the Defendant

The third factor—the history and characteristics of the defendant—poses a closer question.  In considering Klein's history and characteristics, the Court must "take into account the available information concerning" Klein's "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings."  18 U.S.C. § 3142(g)(3)(A).

Here, Klein has strong ties to his "close-knit family," attends a local college, has previously maintained steady employment, has no evident history of drug or alcohol abuse, and, apart from pending misdemeanor citations for unlawful possession of a loaded firearm in public (two counts) and unlawful possession of firearms, has no criminal history of which the Court is aware.  Dkt. 13 at 2–3, 5; *see also* Dkt. 14 at 15.

But that is far from the end of the matter.  As the government explains, "there is also evidence that [Klein] has participated in at least two Proud Boys event[s] during which he was,

10

at the very least, prepared to engage in violent conduct." Dkt. 14 at 11. Most troublingly, on September 7, 2020, Klein brought and brandished a baseball bat at an alleged Proud Boys rally. *Id.* at 13. Certain individuals at the rally later "clashed with approximately 20 Black Lives Matters Supporters," although there is no evidence that Klein was involved in the altercation. *Id.* at 11. Then, on September 26, 2020, Klein attended yet another rally, this time bringing with him a Smith & Wesson, 9-millimeter handgun, as well as a paintball gun. *Id.* at 13–14. The firearm appeared to be unloaded (or, at the least, the magazine was not in the gun) while Klein was at the rally itself, but, as Klein was leaving the rally and the truck in which he was travelling was stopped by law enforcement, the firearm was found loaded in the glove compartment of the vehicle, with the slide locked back. *Id.* at 14. At that time, Klein was, moreover, sitting in the bed of truck, armed with a paintball gun and shield. *Id.* at 13. Based on the observations of the officer who stopped the truck, "the occupants in the bed of the truck were not positioned in a reactive or defensive posture, but were looking to initiate a response from and/or acting violently towards those they perceived to be counter to their ideals." *Id.* "As a result of the September 26th traffic stop, the defendant received misdemeanor citations for unlawful possession of a loaded firearm in public (two counts) and unlawful possession of firearms. The two possession of a loaded firearm in public counts remain pending in Multnomah County, Oregon, and were pending at the time the defendant engaged in the January 6th attack upon the Capitol." *Id.* at 15.

  Klein's decision to bring multiple dangerous weapons to political rallies is disconcerting, particularly in the context of this case—a political gathering turned violent. But, at the same time, the Court is unaware of any evidence that Klein attacked or violently confronted anyone during the rallies; that he used or attempted to use the weapons against any person or property; or that he has ever been involved in any altercations, violent or not, with other individuals. That

provides some comfort, but not complete comfort. At a minimum, for example, Klein's prominent display of these weapons was seemingly designed to inspire fear in his political opponents—to convey a threat of violence, if not the actualization of that violence. The contention by Klein's counsel that Klein carried these weapons for his own protection, Dkt. 27 at 29–30, is difficult to square with photographic images, which depict someone who appears to be looking for, and not seeking to avoid, a fight. But, even accepting counsel's characterization, the Court is left to ponder what Klein would have done—and what he might do in the future—if he perceived that a political foe posed a threat to his safety.

As explained further below, the Court concludes that these concerns are best considered in the context of the fourth factor, danger to the community; that on the current record they weigh in favor of pretrial detention; but that the Court's concerns might potentially be assuaged through appropriate conditions on release (including home detention) and the appointment of a suitable, third-party custodian.

### E.      Danger to the Community

The final factor that the Court must consider is "the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release." 18 U.S.C. § 3142(g). "Consideration of this factor encompasses much of the analysis set forth above, but it is broader in scope," requiring an "open-ended assessment of the 'seriousness' of the risk to public safety." *Taylor*, 289 F. Supp. 3d at 70. In making that assessment, the Court may consider all relevant indicia of risk to the community, including evidence that would not be admissible at trial. *Id.* Because this factor substantially overlaps with the ultimate question whether any conditions of release "will reasonably assure . . . the safety of any other person and the community," 18 U.S.C. § 3142(e), it bears heavily on the Court's analysis. On the facts of

this case, the Court concludes that—at least on the present record—Klein's release would pose an unacceptable risk to community safety.

Starting in December 2020, Klein engaged in a pattern of troubling activity, bringing dangerous weapons to two political rallies and, then, allegedly committing federal crimes while at a third. As explained above, Klein's actions at the Capitol exposed the police officers, who stood beyond the door that he and his brother wrenched open, to imminent danger, and he exposed all those in the Capitol to danger by opening another avenue of entry for a hostile mob. The Court cannot, however, base its dangerousness determination on those grounds alone. As the D.C. Circuit has explained, the threat that an individual poses to the community must "be considered in context" and "whether a defendant poses a particular threat depends on the nature of the threat identified and the resources and capabilities of the defendant." *Munchel*, 991 F.3d at 1283. Accordingly, to the extent that a court bases its dangerous determination on past political violence, the court should analyze whether "the specific circumstances that made it possible" for that violence to arise are likely to manifest themselves again. *Id.* at 1284. This, in turn, requires the Court to consider whether the risk that a defendant poses can be mitigated by supervisory conditions, such as home detention or the presence of a third-party custodian. *See United States v. Klein*, 21-cr-236, 2021 WL 1377128, at *13 (D.D.C. Apr. 12, 2021); *Munchel*, 991 F.3d at 1283–84.

Here, the Court concludes that, despite the serious concerns raised by Klein's conduct on and prior to January 6, it is possible that appropriate conditions on Klein's release might provide sufficient assurances of community safety. These include, by way of example, (1) appointment of a suitable third-party custodian; (2) home detention; (3) GPS monitoring; (4) appropriate social media restrictions; and (5) an enforceable ban on access to any firearm or other weapon.

13

This is not to say that the circumstances undergirding the January 6 and Proud Boys rallies have entirely passed.  But the Court does recognize that strict conditions may address the risk that Klein will participate in violent or threatening political activity while on pretrial release.  *See Munchel*, 991 F.3d at 1284.  And "in the absence of a concrete, prospective threat to public safety that cannot be mitigated by strict conditions, th[e] Court must apply 'the default rule favoring liberty.'"  *Klein*, 2021 WL 1377128, at *13 (quoting *Cua*, 2021 WL 918255, at *8).

The difficulty for Klein right now, however, is that he has failed to identify a suitable third-party custodian.  Klein's first attempt in this regard was to proffer his parents as third-party custodians, albeit without having first contacted Pretrial Services to assess their suitability to serve in that capacity.  Klein's counsel averred during the hearing on Klein's motion:

> If released, Mr. Klein would live with his parents who live in Baker City, Oregon, which is . . . 4.5 to 6.5 hours [driving] . . . from Portland.  And, again, . . . I would reiterate that his parents are deeply[,] deeply religious people. . . . His parents are very responsible people.  They own their home, and, again, they will provide whatever supervision is deemed necessary and appropriate for Mr. Klein.

Dkt. 27 at 29; *see also id.* at 4–5.  The government, however, subsequently offered evidence that Klein's parents are not suitable third-party custodians.  *See generally* Dkt. 14.  That evidence, the authenticity of which is not challenged, shows that Klein's mother texted Klein's brother that "braggers get caught" and that he should therefore avoiding "tell[ing] people [that he was] in the capit[o]l," Dkt. 22 at 2; warned him that his "phone is not encrypted," that he should "[b]e careful what [he] say[s]," and that he should "clear [his] phone" or that he should "[p]ull a Hillary and use a hammer" and "bleach" to destroy the phone, *id.* at 3, 5; and reminded him that a certain individual known to the Klein family "was thrown in jail because he deleted underage girl photos instead of throwing the phone in the lake" and stressed that "[n]othing is ever

deleted," *id.* at 6.  Klein's father, similarly, reminded Klein's brother that "b[r]aggers get caught."  *Id.*

To be sure, hours after the government alerted the Court to the reasons why Klein's parents are not suitable third-party custodians, Klein filed two, short "supplements" with the Court, cataloging a half-dozen other individuals that he believes might serve as a third-party custodian.  Dkt. 23; Dkt. 24.  But Klein has not asked Pretrial Services to vet any of these individuals; he has not offered declarations or testimony from any of them; and he has not performed any of the additional work necessary to present the Court with a well-developed and persuasive release plan.  Pretrial Services' role in the process is critical.  The fact that the prior custodians who Klein identified without input from Pretrial Services turned out be unsuitable custodians highlights the point well.

At bottom, although Klein might still be able to convince the Court that appropriate conditions, including a suitable third-party custodian, would mitigate the risk to community safety that his release poses, he has not made that substantial showing here.  Because the propriety of Klein's pretrial release turns, in large part, on where he will live and who will take responsibility for ensuring that he complies with the terms of his (possible) release, and because Klein has failed to provide Pretrial Services or the Court with a well-developed proposal, the Court must deny his motion for pretrial release, Dkt. 13, without prejudice.  Klein may renew his motion for pretrial release if he has a good-faith basis for doing so, which includes an identification of (1) appropriate conditions of his release; (2) a suitable place to live; and (3) a suitable third-party custodian that Pretrial Services vetted.

15

## CONCLUSION

For the foregoing reasons, Defendant Matthew Leland Klein's Motion for Bond and Institution of Conditions of Pretrial Release, Dkt. 13, is **DENIED** without prejudice.

**SO ORDERED**.

/s/ Randolph D. Moss<br>
RANDOLPH D. MOSS<br>
United States District Judge

Date:  May 3, 2021