**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-237-2 (RDM)** |
| **MATTHEW LELAND KLEIN** | |
| **Defendant.** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the Government requests that this Court sentence Matthew Leland Klein to a term of imprisonment of 9 months, at the midpoint of the guidelines; a fine; $3,000 in restitution; and a special assessment of $125.

**I.      INTRODUCTION**

The defendant, Matthew Klein, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

On that day, Klein entered into the restricted area of the Capitol Grounds and thereafter

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the Government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the Government has sought restitution based on a case-by-case evaluation.

breached the Capitol Building on two occasions. Klein first breached the Building through the Senate Wing Door before exiting the building through a broken window about ten minutes later. Klein then approached a door on the north side of the building where police officers were conspicuously positioned just inside, and working in concert with other rioters, physically forced the door open. As officers struggled to resecure the door, Klein used a Gadsden flag to interfere with those efforts. Once the door was forced open, Klein donned safety goggles and physically positioned himself in order to obstruct officers who were now emerging from the door in an attempt to disperse the rioters.

The Government recommends that the Court sentence Klein to 9 months of incarceration for his convictions under 18 U.S.C. § 231(a)(3) and 18 U.S.C. § 1752(a)(1). Such a sentence would reflect the gravity of Klein's conduct while also acknowledging his early admission of guilt.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The Government refers the court to the stipulated Statement of Offense filed in this case, Doc. 165, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.    Matthew Klein's Role in the January 6, 2021 Attack on the Capitol

#### *Pre-January 6 Activity*

On December 27, 2020, Klein's brother texted his employer that he and Klein "are going to [the] stop the steal rally in D.C" and that "I would like to have the 4th of January 50 the 8th of January off please." Klein and his brother than flew from Portland, Oregon to Philadelphia, Pennsylvania on January 4, 2021.

### *Approach to the Capitol Building*

After attending former President Trump's Stop the Steal rally, during which the former President urged his supporters to march to the Capitol building and discussed the former Vice President's role in the certification, Klein and his brother marched towards the U.S. Capitol Building and entered into the restricted area of the Capitol Grounds, which was closed to the public that day. As the crowd of rioters amassed on the West Front of the Capitol Building, Klein climbed up the Northwest Staircase and into the scaffolding that had been erected for the inaugural stage. *See* Images 1-3. From his elevated position, Klein was in a position to see officers actively working to stop rioters from advancing on the Capitol building and rioters in the crowd assaulting those officers. While inside the scaffolding, Klein became separated from his brother.



*Image 1: Klein (circled in red) on the banister of the Northwest staircase, carrying a Gadsden flag*



*Image 2: Klein (circled in red) climbing within the scaffolding of the inaugural stage*



*Image 3: Klein (circled in red) climbing within the scaffolding of the inaugural stage*

### *Breach of the Capitol Building*

The first breach of the Capitol occurred at approximately 2:12 p.m. when rioters broke

open windows adjacent to the Senate Wing Door. At approximately 2:18 p.m., Klein entered the Capitol Building through the Senate Wing Door carrying the Gadsden flag. He then exited the building approximately ten minutes later, at 2:28 p.m., through a broken window next to the Senate Wing Door. *See* Image 4.



*Image 4: Klein (circled in yellow) entering the Capitol Building 6 minute safter the first breach of the Senate Wing Door*

### *Civil Disorder at the North Door*

Klein's conviction under 18 U.S.C. § 231 primarily arises out of his conduct at the North door to the Capitol Building. Although Klein exited the building at 2:29 p.m., he did not retreat or leave Capitol Grounds at the time. Later on, Klein reunited with his brother and approached the North door. Police officers were conspicuously assembled there to prevent a further beach of the building. Yet Klein joined his brother and other rioters in forcefully yanking the door open, causing damage to the door—estimated by the Architect of the Capitol to be in excess of $10,000—and exposing officers to the violent mob. *See* Image 5.



*Image 5: Klein (circled in yellow) at the North door*

Immediately after breaching the North Door, Klein stepped back and pulled his safety goggles over his eyes. *See* Image 6. Klein took this action because he understood that law enforcement would attempt to resecure the door, including through the use of chemical irritant sprays. After pulling his safety goggles over his eyes, Klein then positioned himself in front of this door to obstruct the officers who were emerging from the building to disperse the rioters. Klein also used his flag to interfere with the officers who were attempting to resecure the door. *See* Image 7.



*Image 6: Klein (circled in yellow) putting goggles on after forcing the North door open*



*Image 7: Klein (highlighted in yellow) positioning himself and his Gadsden flag in opposition to police officers inside the North door*

## III.    THE CHARGES AND PLEA AGREEMENT

On December 1, 2021, a federal grand jury returned a superseding indictment charging Klein

with six counts, including, Civil Disorder, in violation of 18 U.S.C. § 231(a)(3), and Entering and

7

Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1).  On July 17, 2024, Klein was convicted of those offenses based on a guilty plea entered pursuant to a written plea agreement.

## IV.    STATUTORY PENALTIES

Klein now faces sentencing on two counts: Count Three charging Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) and Count Five charging Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, on Count Three (Civil Disorder), Klein faces up to 5 years of imprisonment; a fine of $250,000 or twice the pecuniary gain or loss of the offense; a term of supervised release of not more than 3 years; and an obligation to pay any applicable interest or penalties on fines and restitution not timely made. On Count Five (Entering and Remaining in a Restricted Building or Grounds), Klein faces up to one year of imprisonment; a fine of $100,000; a term of supervised release of not more than 1 year; and an obligation to pay ant applicable interest or penalties on fines and restitution not timely made.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). That Guidelines calculation follows:

<u>Count Three</u>: 18 U.S.C. § 231(a)(3)

|  |  |  |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
|  | **Total** | **10** |

<u>Count Five</u>: 18 U.S.C. § 1752(a)(1).

|  |  |  |
|---|---|---|
| U.S.S.G. § 2B2.3 | Base Offense Level | 4 |
| U.S.S.G. § 2B2.3(b)(1)(A) | Specific Offense Characteristics: | +2 |
|  | *Trespass occurred at a restricted building* | |
|  | **Total** | **6** |

<u>Grouping</u>: U.S.S.G. § 3D1.4                                                    +2

**Combined Offense Level**                                                    **12**
    Acceptance of responsibility (U.S.S.G. §3E1.1)                   - 2

**Total Adjusted Offense Level:**                                         **10**

*See* Plea Agreement at 3; PSR ¶¶ 49-73.

        Moreover, Section 4C1.1 does not apply in this case in light of the defendant's use of violence against people and property, that is, his conduct at the North door to the Capitol Building. *See United States v. Bauer*, No. 21-cr-386-2 (TNM), Doc. No. 195 at 4-5 (defining violence for § 4C1.1 purposes as "[t]he use of physical force," typically "accompanied by fury, vehemence, or outrage" and "unlawfully exercised with the intent to harm"); *see also United States v. Hernandez*, No. 21-cr-445. Open-source video showing Klein's conduct at the North door show him and other rioters using considerable physical force to yank the door open, despite the conspicuous officers on the other side of the door. *See* Exhibit 1 (video).

        Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court were to find that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a

9

person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[2]

The U.S. Probation Office calculated Klein's criminal history as category I, which is not disputed. PSR ¶ 76. Accordingly, based on the Government's calculation of Klein's total adjusted offense level at 10, Klein's Guidelines imprisonment range is 6 to 12 months. Klein's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of the requested term of incarceration.

### A.    Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Klein's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, Klein climbed through the scaffolding of the inaugural stage to advance on the

---

[2] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

Capitol; twice breached the Capitol Building, including just six minutes after the initial breach of the building; damaged Capitol property while creating an additional access point for other rioters; and obstructed Capitol Police in their effort to quell the unprecedented unrest and to protect the elected representatives inside the building.

The nature and circumstances of Klein's offenses were of the utmost seriousness, and fully support the Government's recommended sentence of 9 months of imprisonment.

### B.    The History and Characteristics of the Defendant

Klein was 24 years old when committed the offense and is now 28 years old. His father is a pastor; his mother does not work outside the home. PSR ¶ 82. Growing up, Klein's family moved frequently for his father's missionary work. *See* PSR ¶ 84. And Klein lived outside of the United States in Chile and Argentina from 2008 until 2020. *Id.* Prior to his arrest, Klein worked at a Dominos in Newberg, Oregon. He also attended school at George Fox University. As noted above, Klein has no prior criminal history. He was, however, charged in September 2020 with local offenses— possession of a loaded firearm in a public place—in connection with a Proud Boys protest. PSR ¶ 78. Though those charges were ultimately dismissed, Klein's history and characteristics do not warrant a downward variance.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of

power.").

**D.    The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of the requested term of incarceration.

Klein's conduct on January 6 evinced his willingness to engage in serious political violence against sworn officers defending the U.S. Capitol and the elected officials operating within it. In particular, after seeing multiple assaults on officers while on his path to entering the building, Klein chose to exit the building and participate in a joint effort to rip open an additional exterior door to the Capitol. In doing so, Klein understood that he was creating an additional access point for other rioters and that his actions would subject officers to additional assaults by the mob. A term of incarceration reflecting the unconscionability of such an attack is necessary and appropriate here to ensure that Klein does not engage in such conduct again in the future, particularly where he engaged

12

in this conduct just a few months after his arrest in Oregon.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18

U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently— differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[3] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[4]

---

[3] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the Government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

To date, few defendants have been sentenced for the precise combination of convictions that Klein has pled guilty to here. There are a small number of cases in which defendants have been sentenced to standalone convictions under 18 U.S.C. § 1361 (damage to Government property), which is somewhat factually comparable to Klein's conduct at the North door here. In *United States v. Hunter Ehmke*, 21-CR-029 (TSC), the defendant kicked and punched out three exterior windows of the Capitol Building adjacent to the Rotunda doors on the east side of the building; Ehmke pled guilty to one count of violating 18 U.S.C. § 1361 for this conduct. Unlike Klein's conduct, Ehmke did not break through windows or doors that were immediately being defended by Capitol Police. With a guidelines range of 0-6 months, Ehmke ultimately received four months' incarceration, 36 months' supervised release, and $2,821 in restitution. Similarly, in *United States v. Troy Elbert Faulkner*, 21-CR-126 (BAH), the defendant kicked in several windowpanes on the west side of the Capitol building. The defendant received a sentence of five months' incarceration, 36 months' supervised release, and $10,560 in restitution, based on a guidelines range of 2-8 months in light of the defendant's Criminal History Category III and offense level 6. Here, the Court should consider a lengthier sentence than either Ehmke or Faulkner received, because of the increased danger posed by Klein's coordinated attack on the North door, in direct confrontation with Capitol Police, coupled with guidelines that properly reflect the danger and violence inflicted by the defendant.

*United States v. Peter Krill*, 23-cr-342 is also instructive. There the defendant pled guilty to a single count of engaging in civil disorder, in violation of 18 U.S.C. § 231. There, the defendant pulled a barricade away from officers on the West Plaza, allowing another group of protesters to push

into the officers, and ultimately entered and remained in the Capitol Building for approximately 47 minutes. *See* 23-cr-342, Doc. 34 at 3-8 (Gov't Sent. Mem.). Based on his guidelines range of 10-16 months, the Government recommended a period of incarceration of 13 months; Chief Judge Boasberg sentenced Krill to 9 months of incarceration. *Krill* is a useful comparator here, because Klein's actions at the North door were not just about the property destruction—Klein's conduct also exposed police officers to the violent mob, just like Krill's pulling away of a barricade from officers outside of the building exposed those officers to further harms.

## VII. RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[5] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. As the plea agreement reflects, the

---

[5] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. Plea Agreement at ¶¶ 11. Klein is accountable for some of this damage, as his attempts to forcibly open a door on the north side of the Capitol Building resulted in structural damage to that door. Thus, pursuant to the plea agreement and as permitted under 18 U.S.C. § 3663(a)(3), Klein has agreed to pay $1,000 in restitution for the damage to the door and an additional $2,000 in restitution for his contribution to the aggregate damage to the Capitol Building. *Id.*

**VIII.   FINE**

Klein's convictions for violations of 18 U.S.C. §§ 231(a)(3) and 1752(a)(1) subject him to a statutory maximum fine of $250,000 for Count Three and $100,000 for Count Five. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); U.S.S.G. § 5E1.2(d). The Sentencing Guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, Klein has not shown an inability to pay. Thus, pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $2,000 to $20,000. U.S.S.G. § 5E1.2(c).

## IX.    CONCLUSION

For the reasons set forth above, the Government recommends that the Court impose a sentence of 9 months of imprisonment; a fine within the range of $2,000 to $20,000; $3,000 in restitution; and a special assessment of $125.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    /s/ Katherine E. Boyles
Katherine Boyles
Assistant United States Attorney
D. Conn. Fed. Bar No. PHV20325
United States Attorney's Office
601 D Street NW
Washington, D.C. 20001
Katherine.Boyles@usdoj.gov
Phone: 203-931-5088